and getting all set up, but I'll go ahead and call it. And as noted before, we'll take a break after the second case. Our second case is number 20-10709 United States v. Rose Litzky. As noted before, we'll take a break after the second case. And as noted before, we'll take a break after the second case. Okay, Mr. Langs, whenever you're ready. Thank you, Your Honor. Good morning. May it please the court, my name is Steve Langs. I represent Rose Litsky. She's the appellant in this case with me at counsel table as Adil Bashir. As a prologue, I have a tendency to speed up. This case is very significant in my mind. I have a passion for mental health. If I tend to go too fast, please slow me down. Lots to get to in this particular instance. Well, let me just say that we know it's a complicated case with a big record, and there's no way you're going to get to everything at one time. So whatever you've presented in your brief that you don't get to today, we're certainly going to consider. Thank you, Your Honor. Ms. Litsky, as we stand here at the podium, is 35. She has been diagnosed as mentally retarded. We used to call it that term. She's now intellectually disabled. It's a term that we use today. She's been sent to prison now for 30 years. The overarching principle for this particular case, I would submit, is the wholesale exclusion of her defense at trial. It starts with Dr. McLean, the introduction or proffered testimony of an expert witness in this case to explain Ms. Litsky's diagnosis, how that plays into the overarching case, which leads into the trial, ultimately at which the district court in this case gives a wholesale exclusion to the proffered defense. The theory of defense in this case, we call it diminished capacity. It was an explanation in terms of what Ms. Litsky presented or brought to the table for purposes of these charges. Obviously, she was charged in three counts as conspiracy, the actual production of child pornography, and count four was the simple possession and all of this. What the district court did in this instance, I think, and with great respect for the court, I've litigated many a question before, and I don't have fault for the intent here. I think what the district court did was overthought and got itself outside of the box. The court became too enmeshed in form over substance and took to Hart 702, Daubert, and the analysis and finding out or figuring out whether or not Dr. McLean could actually testify. The court references these issues. You can see and read, and the impression I get from the transcripts, is the court struggles dearly with whether or not Dr. McLean should testify, which I think the district court was inclined to do, but the extent or quality or scope of that testimony. Ultimately, over the course of this two-day evidentiary hearing, we have testimony, we have argument. I think that, at least our position is, Dr. McLean is clearly qualified. I don't think we have any issue with that. Her testimony is based on reliable information, and clearly, I would submit that it would be helpful in terms of explaining to the jury what's going on with Ms. Linsky. I think if I were on the jury, I would want to know that the individual that I have in front of me operates at a third-grade level. Let me ask you a question, and maybe this is what you mean by form and substance, but I guess I thought the district court's chief complaint here was that the report really doesn't speak to the salient issue of mental capacity to form the mens rea, and instead is really geared toward volition, which the IDRA seems to take off the table. I think where the district court misunderstood what was going on is that, in this instance, Dr. McLean effectively has two positions. She was initially asked to evaluate Ms. Linsky for competency back in March of 2018, so she has a written report. Subsequent to that, she's indicted at the end of 2018. They get in the trial mode in 2019. Dr. McLean revisits with Ms. Linsky again a year later in March of 2019, but does not come out with a second or subsequent written report. Her testimony, her proper testimony at the evidentiary hearing, is what the district court in this case has to work with. When we say report, I take that to mean the actual written report that was done for March of 2018. The testimony or the presentation of defense I take to be flowing from her second evaluation from March of 2019, going into the explanation that Ms. Linsky is mentally retarded. Ms. Linsky is or does suffer from intellectual disability, and that comes from the testimony at the evidentiary hearing. I think the way I read the district court's order in this instance was to say, I don't have comfort in allowing Dr. McLean to testify because I don't think, I think the word used here is Dr. McLean's testimony is adequately keyed to the issues that we have here. We disagree with that. Which issue was only intent, was it not? That was the issue, that the evidence could have been admitted for. Yes, I'm sorry. Yes, Judge Carnes, yes. And there was also undisputed evidence that she knew that what she was doing was wrong. She conceded that in cross-examination, didn't she? That's the language that was used, but that was the contest. As you have an intellectually disabled individual, like the district court pointed out. So the expert testimony would have gone to whether the jury should believe what she said in cross-examination that was damaging to her case? Context. I didn't understand that was the theory on which you offer. Right. The theory of defense is diminished capacity, which is going to the requisite intent for these charges. In terms of count one, that is a specific intent crime. Counsel, you're not answering my question. Did you offer the expert testimony as a basis for arguing to the jury that it should not believe anything she said that was harmful to her during her cross-examination?  The answer, of course, is that you did not. I think in the oral argument part of the evidentiary hearing, trial counsel submits, we would like to take the district court up on its offer to admit Dr. McClain to explain Ms. Linsky's interview to investigating officers. I'm not asking you about counsel. I'm not asking you about her interview with investigating officers. I'm asking you about her testimony in front of the jury. Yes. Yes. Her testimony was yes. I took the pictures. Yes. No, her testimony was that she knew that was unlawful. Yes, there is that testimony. Yes, I agree with you. Okay, so she admitted the jury. She knew it was unlawful. Yet you still think that she, because of her mild intellectual disability, she couldn't form the intent to do it, even though she knew when she did it that it was unlawful. Not that she couldn't form the intent. It's that she didn't have the intent. She didn't have the intent, even though she was intelligent enough to explain to her husband how to work the software OOVU chat function of the camera and that she regularly operated the camera and sent to him child pornography images. Right. That's undisputed, isn't it? She took those actions. Yes. So she wasn't so intellectually disabled that she couldn't figure out how to operate software, which I don't say this to be facetious, but some of us have difficulties with, but she did. She understood and she explained that to her. I keep calling her husband to her boyfriend. And yet it you're saying that the trauma might have come out differently if you could have just told the jury that she was mildly mentally retarded. I'm sorry intellectually disabled. I would submit, Your Honor, that the discourse we just had would have been proper in front of the jury. That would have been the province of the jury, because over the course of five days at no point was this jury ever told that Rose Litsky suffers from an intellectual disability. How would that have played in the deliberations in terms of. So whenever, whenever, regardless of the other facts, whenever you exclude from the jury that it was evidence of intellectual disability, intellectual disability, it taints the verdict and requires reversal. The overarching issue here is whether or not the exclusion of Miss Linsky's wholesale theory of defense is a constitutional violation. Part of that. Now, that's that's that's one issue. The second issue is whether it was harmless error if it was an improper ruling. And I don't understand how any reasonable juror could say, all right, this woman really had enough mental state and faculty powers to operate that Snapchat, not Snapchat, OOVU program and teach her fiance how to handle it and to upload these cameras and to transmit the images to him when he was in a different state. But she couldn't have intended to do it. I think it would be document 108. I think it's page 211 in which Dr. McLean specifically would address that concern. Again, our overarching position is that the jury was. Wait, wait, wait, wait, wait. Excuse me for not having it in front of me, but you explained how it addresses my concern. Tell me what's in that document. That's the evidentiary transcript in which Dr. McLean effectively says the scope. And these are my words, my interpretation, the scope and quality and effect of Miss Linsky's intellectual disability and how it plays in her functioning and adaption in real world situations. For example, using a cell phone, what it takes to take those pictures, what it takes to send those pictures. Yeah, but she didn't say, did she, that she was intellectually disabled to the extent she couldn't form an intent to take an action. I see that my time is over, Your Honor. May I answer your question? Yes, sir. Right ahead. I hope the take, again, is should we approach someone who is mentally retarded or intellectually disabled differently than, say, a lawyer at a podium explaining Rule 702 or Daubert? Ultimately, our position is that the jury in this case was never afforded the opportunity to absorb this type of information, deliberate, and for itself render as a factual finding whether Miss Linsky, in fact, rendered the specific intent to hold her criminally liable for this case. So can I just ask a follow-up question because it circles back to where I started? So I've looked at the transcript, and as far as I understand, when McLean was asked specifically whether people with intellectual disabilities have the wherewithal to form the intent, she said they're capable depending on the person. She didn't, so far as I can tell, then specify whether this defendant did or didn't form the intent. She couldn't have under 704B. But all she said was based on a reasonable degree of psychological certainty that Linsky would not have taken the pictures if Okendo hadn't requested them. See, that to me, and this is why I say it circles back to where I started, that to me sounds like volition, not mens rea. And volition is what, for better or worse, the IDRA has taken off the table. Right, and I agree with you. That specific opinion, I agree with you, would not be admissible. She can't, Dr. McLean can't render an opinion on ultimate fact. But in terms of an actual trial, you run through the hypotheticals, you throw out your diagnosis, you explain where all this coming from. In closing, we can certainly make the argument in terms of inference as to whether or not Ms. Linsky did in fact render the specific intent to commit the crimes that she's charged with. Again, the question here is not whether Ms. Linsky was incapable of rendering intent. And I appreciate that reading. Dr. McLean never said that. In fact, I take the opinion that she could have. The question here is, did she? And without the theory of defense, without the help of Dr. McLean, without the explanation of anything to do with intellectual disability, anything to do with diminished capacity, the jury was prevented from even engaging in that conversation. And that's where we come out with, look, above and beyond a 702 violation, we actually have a Hearn violation, we actually have a Fifth and Sixth Amendment violation that necessitates a new trial. Let me ask you one thing quickly before you sit down. Yes, sir. I had a hard time, and everybody seems to assume it, that she wouldn't have done it if he hadn't asked her to do it means she didn't have any intent to do it. That doesn't follow at all. I mean, one of my colleagues can ask me to send them something, and I can send it to them, and I wouldn't have done it if they hadn't asked. But that doesn't mean I didn't intentionally send it to them. What am I missing there on that syllogism? I don't understand. You're not, Judge Carnes. That's exactly what the district court struggled. I agree that that ultimate opinion by the expert would have been inadmissible. You can't give that but for. No, no, no, no, no, no. And this may be me, but help me. I'm sincere about that. That's not an argumentative setup. The fact that she wouldn't have done it but for the fact that he asked her to do it doesn't mean that she didn't intentionally do it after he asked her to do it. What am I missing about that line of reason? The impact and effect of her intellectual disability and how it plays specifically on that exact question. Isn't it a combination of going back to Judge Newsom's question and Judge Carnes' too? Isn't it a combination in Dr. McLean's opinion of her intellectual disability and the PTSD that she thought that she suffered and those two things combined would have led to her inability to have the mental state? Yes. I mean, that's what she said, right? Yes. Now, did trial counsel ask her when she testified whether she was intellectually disabled? No, because the district court said she couldn't. Couldn't ask. Well, the district court said you couldn't have the expert testify. I've looked at the order. The order deals with the expert. You couldn't have asked her? No. At the beginning of a defendant's case in chief, trial counsel specifically asked. There were some questions about social security records, school records, and things of that nature. Trial counsel specifically asked, may I engage in any inquiry about mental health or intellectual disability? No. The actual language was you may not engage in duress as an affirmative defense, and on top of that, you may not introduce or talk about mental health or intellectual disability. And at the time, right before Ms. Linsky testified that she was called, again, trial counsel asked, Your Honor, may I ask Ms. Linsky about mental health and intellectual disability? The government got up and said, Judge, you've already ruled on that. Is she allowed to do that? His response at that point was, you can make the objection if she asks the question. So going forward, I think the district court's order informed trial counsel or Ms. Linsky about how going forward and what she could do in terms of her presentation. But we take the position at the beginning of her case in chief, she was prevented wholesale from engaging in any diminished capacity or any intellectual disability conversation. All right. Hence, the constitutional violation. Okay, thank you, Mr. Lang. You saved your time for rebuttal. Thank you, Your Honor. You've got to take your little cover with you. Thank you. May it please the court, Roberta Bodner for the United States. If I could start with Judge Carnes, one of your last questions that led into questions from all three of you. During the trial, the court made an effort to explain that there is a difference between a defense based on lack of intent and a defense based on duress. Duress is an affirmative defense. It doesn't have anything to do with eliminating intent. I'd point the court to Document 247 at 5 to 6. That's where the court is going through its reasoning. That is the basis for the problem with McLean's expert testimony and why McLean's testimony was absolutely the kind of testimony that Cameron condemns as violative of the Insanity Defense Reform Act. But you can have mental health . . . Of course, the devil's in the details, but we've held that you can have medical testimony of one kind or another to try to fight the element of specific intent. Yes. Where is the gray line between those two things, between the Cameron line of cases, the other line of cases? Okay. How could this expert have skated that line and rendered an admissible opinion? Okay. First of all, McLean originally examined Litsky for competency and sentencing mitigation. When she did her initial examination report, she did not have a single shred of the actual evidence of this crime. I'm not asking you about this case. I'm asking you more globally and more abstractly. Okay. Well, in the abstract . . . Assume that an expert is qualified, does all the examinations that you would want the expert to do, is credentialed, there's no methodology problem or anything, and assume that there is a specific intent crime. Okay. What can the expert testify to without going afoul of Rule 704B in Cameron? Well, if I could put it in the context of a child porn charge, the production charge that we have here, because the specific intent, if there is one . . . No, no, no. I need you to assume that there's specific intent. Okay. Assuming that there's specific intent. Under our case law, the mental health non-insanity evidence has to address the specific intent element within that crime. Yes. So, it would have to be evidence that was targeted to say, I am so intellectually disabled that I could not comprehend that this was sexually explicit conduct. But . . . Or that taking these actions . . . . . . that constitutes an element of the crime charged as a defense. Those matters are for the trier of fact alone. Right. So, I'm trying to get you to help me with, in the right case, what can an expert who is duly credentialed, competent, does all the right examinations, what can that expert testimony say in a specific intent case without running afoul of Rule 704B? It would have to be evidence that a particular person's intellectual disability is so great that that particular individual could not differentiate between innocent and sexual conduct. That goes afoul of 704? I don't think . . . You're telling the jury that that individual can't have the mental intent? I don't think that that's the further statement that in this case, under these circumstances, she didn't intentionally pose her children. Boy, you're really . . . I invited you to answer the question, so I'm not blaming you, but you are really slicing that really thin. And I think you have to because of the danger of this kind of evidence, and that's what Cameron . . . So, the government would be okay with the answer you gave of having a defense expert testify to that fact? If the facts and the expert were such that they could say that a particular individual's disability was sufficient to be unable to differentiate sexual from non-sexual conduct, I don't see how that would not be admissible, but that's not at all what happened in this case. Oh, I gave you a hypothetical. I know. So, the way I've always tried to understand that divide when I was a district judge was this. If you had the right expert who was credentialed, did the right examination, no daubered issues, nothing like that, the expert could say, yes, I have diagnosed the defendant's name with this thing. And what does that thing mean? Well, a person, a person, not the defendant, but a person with this thing may have trouble differentiating between this or that or that or what. And then you let the defense and the government argue inferences to the jury. Right. I understand that . . . But cannot say, you know, Mr. Jordan could not have had the mental intent necessary to constitute . . . Well, okay, so the problem in my answer to your question then would be to say you would have to back up one step and say a person with this level of intellectual disability cannot differentiate between sexual and non-sexual . . . Or generally can't to a degree of medical certainty.  By the way, as an aside, I may have gotten it wrong all those years on the district court too, so don't take my statement as gospel. I'm just trying to understand how you drive that line of admissibility. But I do understand the court's point, and that is where I was starting with. There is a way to present this in an admissible manner. This wasn't it. This was miles away from it. This was exactly the kind of testimony that Cameron condemns. Because what McLean initially said, and she said this at the hearing, was that Litsky's mild intellectual disability coupled with her history of victimization prevented her from forming criminal intent. And that she was more vulnerable with regard to manipulation and coercion. She's absolutely mixing lack of intent with duress, and they are apples and oranges. This is the kind of justification or excuse evidence that she cannot present through an expert witness. I know, but . . . and I agree with you on those points, on her ultimate statements as you described. I agree with you. But, for example, at the evidentiary hearing when the court was listening to all this, the court's first instinct was to allow some limited testimony about intellectual disability. So here's what the district court said. It then changed its mind when it issued the written order. Here's what it said at the hearing, and this is document 111 at pages 31 to 32. I would permit her, McLean, to testify with regard to the fact that she examined Ms. Litsky, that she finds Ms. Litsky to be suffering from intellectual disability, and that the intellectual disability may make her more vulnerable to manipulation or duress, and leave it to the jury to decide whether or not that, in fact, was a factor, either in the statements that she made to law enforcement or her participation in the criminal conduct. In other words, the district court's first instinct was to let the testimony go in with regards to intellectual disability and PTSD and what those two things generally mean, and to let everybody argue it to the jury. Why was the district court's first instinct wrong? Because once the court had the opportunity to examine the cases with respect to the Incentive Defense Reform Act, it realized that those were two different things, and that's why later on in the trial, at the page I mentioned in document 247, the court explained there's a difference between lack of intent and duress, and putting that in context with the case law, realizing that McLean's testimony had nothing whatsoever to do with Litsky's intent at the time of the crime, because it didn't examine any of the circumstances of the crime. She read all of that evidence only in preparation for the hearing, after she'd formed her opinion. That's why the court restricted it. And by the way, nothing whatsoever restricted Litsky from being on the stand and being asked, are you intellectually disabled? Do you have difficulty understanding something? Well, the district court sent some signals indicating that that testimony was off the table. What was off the table, Your Honor, was evidence of duress, and that is because although several times . . . about intellectual disability when Ms. Litsky was going to testify, the district court initially said, no, you're not going to ask about that. I think if you look back at it, what you will find is that as they proceeded to present their case, defense counsel says, I'm now presenting a duress defense, and the court said, you're not getting a duress defense because there's no immediacy. They also offered some late disclosed documents, a health care surrogacy form and some social security records, and the judge excluded those because they were late disclosed. The prosecutor asked, is this evidence coming in? And the court said, I'll rule on the question before me when the question is asked. The court excluded the documents that were late disclosed. Litsky was never, ever asked, do you have trouble understanding things? She was asked why she admitted to having taken the photograph during her interviews with the officers, and she said, because they kept asking me. All right, let me shift you to something else, and this may not be something that bears on the ultimate result in the case, but it's something that bothered me when I read the record. The district court had indicated through its order on the motion in limine, that McDaniel was not going to be able to testify with regard to her opinions, right? McLean, yes, Your Honor. McLean, I'm sorry. Too many names, too many cases. Yes, Your Honor. Yes. But then on redirect of the case agents, the prosecutor asked the case agent whether or not in dealing with Ms. Litsky, he had assessed any type of intellectual disability for her, and he said no. And then he also asked whether or not Ms. Litsky had told him, the agent, that she was intellectually disabled, and his answer again was no. That's right. That doesn't sit well, because the government is asking for exclusion of intellectual disability evidence, maybe rightfully so, and then it's sort of planting a little seed like, no, she doesn't have an intellectual disability, don't be misled by this, you know. Your Honor, I absolutely agree that the defendant's initial brief makes it look like that, but the testimony did not, and if I could explain why I'm not. I read the redirect. It doesn't look good. Okay. Again, it may not be case dispositive, but I'm saying it doesn't look good that you, and I don't mean you personally, the government asked for exclusion of this body of evidence, and yet on redirect, the last shot you're going to get at the case agent in your case in chief, you get in a couple of questions about intellectual disability, the topic you asked to be excluded. And it makes it look like we're having it both ways. I understand that. Yes, it does. I'd like to explain why that is not the case. Go. When we offered at the initial hearing Witzke's statements to the officers, in the statements themselves there are indications that she didn't understand something and then had to spell it out or that they didn't understand her and she was spelling it out. There are also statements from her about duress generally. He's mean to me. He comes to my face like he's going to hit me, those kinds of things. In its initial order, the court seemed to indicate that Witzke's intellectual disability, not from McLean because she wasn't asked for that opinion. That opinion was never disclosed to us in discovery documents. She didn't form that opinion. But Witzke's intellectual disability might be relevant to put those statements to the officers in context so that the jury could appropriately weigh them. When the prosecutor put up agent's stake in the case in chief, the prosecutor asked two questions whether, I've got them exactly here, whether during the recorded interview if Witzke appeared to understand the seriousness and the scope of the investigation and whether there was anything that led agent's stake to believe that Witzke was not clear of mind. Those are the questions on direct. On cross, Witzke's counsel got up and began asking whether false confessions are real, what do you think clear of mind is, have you been trained to talk with people with speech impediments, have you been trained to talk with people with invisible disabilities, including autism spectrum disorder and invisible disabilities. Having cross examined the officer on whether the agency, the officer's agency had a particular policy on dealing with people with autism spectrum disorders and shouldn't they have had someone present with Witzke if she had something within autism spectrum disorder and isn't an intellectual disability within autism spectrum disorder. Extensive cross examination on that. So on redirect, the prosecutor asked. You're telling me that the defense lawyer asked whether intellectual disability was part of an autism spectrum disorder? With those words? Within the document that she was cross examining on, the agency's policy on dealing with people with autism spectrum disorders. Whether intellectual disability was within the umbrella of that policy. And so that opened up the question of whether this agent had done anything wrong and whether she saw any intellectual disability. Now you've gotten the topic of intellectual disability into the record. Right. And it probably was appropriately in the record for purposes of determining whether those statements to the officer were voluntary or whether she really understood what they meant. So then should Ms. Witzke have been allowed to testify about whether she had an intellectual disability? Yes, but she was never asked. The district court and the government didn't object to that? We objected to the introduction of the documentary evidence that was late disclosed. There were never two questions. There was never a question, are you intellectually disabled? I haven't seen these requests, so I haven't read them, but there weren't requests by the defense to be able to inquire on intellectual disability when the case was testified? I think the court in its initial ruling said, you're going to be allowed to present your defense, just not the way you want through your expert. That's how I understood the court's ruling all throughout the case. The order on the motion and limit doesn't say anything like that, by the way. The court may have said it at some point during the trial, I grant you that, but the order excluding the expert doesn't say anything about that. You're not putting her in, you're not putting the expert in, but you may be able to ask Ms. Witzke about intellectual disability if and when she testifies. I think it's several times during the course of the trial the court says that the court had considered intellectual disability as being something relevant for purposes of evaluating the statement. The duress evidence came in through the statements anyway, because she made those statements. There was no way to excise that from her statements to law enforcement. But this was not a wholesale exclusion of a defense. This was an exclusion of expert testimony, which was not directed to this defendant's specific intent at the time of the crime. Okay, Ms. Barnard, thank you so much for your help. Mr. Langs, you've got five minutes. Ms. Barnard suggested under her reading of the trial transcript, the district court didn't completely prevent you from asking Ms. Witzke about whether she personally had intellectual disability or was diagnosed with that. I disagree, Your Honor. For the purposes of the audio and your clerks, document 247, page 10 and 11, document 247, pages 98 and 99. Those specific pages go directly to that question. I still take the position, I'll use the language, a wholesale exclusion of a theory of defense. Just running through some of the court's questions, at any point, for example, on the direct examination, that particular witness you were talking to is Asia Stake. She was the investigating officer for this case. On redirect, our position, as referenced in the brief, is to say that they effectively opened the door. They say you did it before on cross. No, I disagree with that interpretation because in terms of that cross-examination, she was getting into those issues, but not once did trial counsel ever use the words intellectual disability in the sense of asking, is my client, the person I represent, the person you interviewed, intellectually disabled? That never came up. I'll take one step back here. The affirmative defense of duress is not a part of this case. It was not raised. The issue presented is whether or not we, Ms. Litsky, could have presented evidence of diminished capacity, mental health issues. The document records, Social Security, school records, power of attorneys, those were excluded. The judge said, I'm not letting those in. You violated my scheduling order. Those were untimely disclosed. You don't get to get those in. Trial counsel never chased that down. What trial counsel was attempting to do was question in terms of intellectual disability. Going forward during the course of trial, and I'm very mindful of the district court's written order in this case. My position there is you have two days of evidentiary hearing. He takes it under advisement. He uses that language that the court pointed out, which I think is the right way to have addressed this issue. The court's first inclination was the right one. A limiting instruction or a limiting admission of this type of testimony certainly would have, at least given a jury, the context, I think it would have appropriately needed, whether in deciding the statements that were made to law enforcement should be accepted as true, accurate, correct, reliable. Hence, we flow into the whole 702 Daubert analysis in this instance because as a gatekeeping function, the district court has to find and ascertain whether or not the proffered expert testimony is qualified. There's no doubt about that. Is it reliable? We take the position that it was. Counsel. Yes, sir. Did you argue to the district court before the district court made its ruling that you wanted the evidence of intellectual disability admitted to go to the question of how much weight the jury should give to her statements to law enforcement? I think the way I read the transcript, that was the district court's inclination. I think that's what the district court felt strongly about. I don't even... The way I read the transcript... I'm not asking what the district court felt strongly about. I'm asking what... And I keep saying to you, but trial counsel argued to the judge, trial counsel wanted to admit the evidence of intellectual disability for the purpose of... And was that for the purpose of showing whether she had an intent to commit the crimes or was that for the purpose of arguing to the jury that law enforcement officers overwhelmed her will and therefore her statements that incriminated her weren't truthful? I understand what you're asking, Judge Carnes, and if I can recall, I don't... I wish I had a photographic memory. In the evidentiary hearing, there is a point, there is language in which Ms. Mlinsky, trial counsel, said, Your Honor, if you're willing... I'm paraphrasing. But asked that if you are going to allow this type of evidence for purposes of voluntariness, i.e. connect it with the suppression motion, she invited that. She was... The language in the record, and if I can find the pinpoint site for you, I will, is to suggest, Judge, if you're going to give it to me, I'm going to take it and I'll ask for it. So a very long-winded answer to your short question, yes, there's language in the record from defense counsel asking, I want to admit this evidence for purposes of her statements. I hope that's satisfactory, Your Honor. If I had the pinpoint site, I could give it to you. That sounds like a winking and a prayer, but we'll check. Well, yeah, I'm confident, Your Honor, and I can find it. I'm asking Mr. Beshear over here if he can trace it down. I've highlighted it, and I can pull it up for you. But the overall request is to ask the district court in this case, effectively, look, our theory of defense is diminished capacity. And again, I'm using my language here at the podium. We want to present mental health issues. We want to present and give the jury the opportunity to at least accept Ms. Blinsky's intellectual disability, what that means, the effect that it has, and at least give her context to have her day in court so as to not violate her Fifth and Sixth Amendment rights to compulsory process as well as to due process in this instance. Our relief at the end of the day is to ask for a new trial. We think the jury should have heard this type of testimony, limited or otherwise. It could have been properly done. Ultimately, our claim, our argument, district court just wholesale excluded any opportunity to present intellectual disability in this case, and we find that to be harmful there, beyond a reasonable doubt, and we would ask for a new trial. All right, Mr. Langs, Ms. Bodnar, thank you both very much. We will take a five-minute break and then hear the next case. Thank you.